194 So.2d 746 (1966)
Raymond BROWN et al.
v.
B & G CRANE SERVICE, INC. and/or Sun Erection Co., Inc., et al.
No. 2256.
Court of Appeal of Louisiana, Fourth Circuit.
July 5, 1966.
On Rehearing February 13, 1967.
Writ Refused April 14, 1967.
*747 Ralph E. Orpys, New Orleans, for plaintiffs-appellants.
Henican, James & Cleveland, C. Ellis Henican, Jr., New Orleans, for Jack O'Shea, plaintiff-appellant.
Christovich & Kearney, Lawrence J. Ernst, New Orleans, for intervenor-appellant.
Adams & Reese, Thomas J. Wyllie, New Orleans, for defendants-appellees.
Before YARRUT, SAMUEL and BARNETTE, JJ.
BARNETTE, Judge.
This suit arises out of an industrial accident, March 15, 1963, in which Raymond Brown and Jack O'Shea, both ironworkers, were injured while in the employ of George Construction Company. Great American Insurance Company, compensation insurer of George Construction Company, made substantial payments of workmen's compensation to each of them.
Brown and O'Shea brought this suit in tort against B & G Crane Service, Inc., alleging that the proximate cause of their injuries was the negligence of a crane operator in the employ of B & G. Great American intervened seeking judgment against B & G for the sums paid by it to plaintiffs in compensation and medical benefits. Defendants filed a motion for summary judgment which was granted by the trial court on the authority of Truitt v. B & G Crane Serv., Inc., 165 So.2d 874, decided by this court in 1964. An appeal was taken from the summary judgment dismissing plaintiffs' suit and the intervention, and this court reversed the lower court and remanded the case for trial, Brown v. B & G Crane Serv., Inc., 172 So.2d 708 (1965).
After trial on the merits on remand, judgment was rendered in favor of defendants dismissing plaintiffs' suit and the intervention based upon two findings, namely: (1) that defendant's crane operator was not negligent; and (2) that he was a borrowed servant and our decision in Truitt v. B & G Crane Serv., Inc., supra, was controlling. The first finding was one of fact, and the second was one of law.
George Construction Company was engaged as a subcontractor in the erection of a structural steel frame for a building at the Delgado Trade School in the City of New Orleans; Brown and O'Shea, skilled *748 ironworkers, were employed by it on that job. George Construction Company entered into a verbal contract with B & G Crane Service, Inc., for the rental of a 35-ton crane at an hourly rate for use in lifting and placing the structural steel. An experienced crane operator and an oiler were furnished with the crane as a part of the agreement.
In the course of the erection of the steel frame of the building it became necessary to lift and secure in position atop a row of steel supporting columns trusses for the framing of the roof. These trusses were triangular members measuring approximately 115 feet in length and 20 feet from the base member to the apex. They weighed approximately four tons each. Between these roof trusses was to be placed an "X" brace in a position parallel to the outer walls, thus making the roof trusses rigid and secure.
The first truss was lifted into position and bolted on each end by the ironworkers, known in the trade as "connectors." Before the second truss could be raised and secured with "X" bracing between it and the first truss, it was necessary to secure the first truss temporarily with steel cables attached to it at or near the apex and extended in opposite directions to anchor posts. These cables or guy lines were made taut by means of a turnbuckle at the anchor end of each one. One of these guy cables extended out from the building and was attached to an iron post. The other extended into the framework of the building and was anchored to one of the perpendicular columns.
The plaintiffs Brown and O'Shea climbed to the top of the first truss and were in position to receive and connect the "X" brace, which was to be hoisted into position by the jib line of the crane after the second truss was hoisted and held in position by the load line of the crane. Other connectors were to receive and connect the second truss to its supporting columns.
The second truss had been raised and was being lowered into position when it came in contact with the guy cable anchoring the first truss to one of the vertical columns. The cable was in such position as to prohibit the truss from being lowered into positionthat is, the cable passed through the triangular plane which the truss would ultimately occupy. Of all the witnesses, only the crane operator denied that the truss came into contact with the guy cable, and we find as a fact that it did make contact with such force as to place great stress on it and to cause an equal stress to be placed on the opposing guy cable.
At this point a manila rope was thrown up to Brown and O'Shea who tied it to the top of the truss; the other end of the rope was tied to the crane. This rope was to serve as a substitute guy line so the guy cable could be loosened at the turnbuckle, permitting it to slack and hang below the point of interference with the truss being lowered into position.
There is some disagreement among the witnessees as to whether the truss was allowed to remain in contact with the guy cable or whether it was raised above the cable. Also, there is some dispute as to whether it was again lowered, thus coming in contact with the guy cable the second time. The preponderance of the evidence supports the conclusion that it remained in contact with the guy cable and continued to put great stress on the cable. This is evident from the fact that at the point of contact the cable was held in a tight angle as opposed to extending in a straight line or hanging in a slight curve between the two attached ends. There is little or no dispute that when contact was made with the cable the truss to which it was attached and on which Brown and O'Shea were perched was pulled in that direction, thus placing a great stress on the opposing cable. At this point A. J. Stockfelt, the building foreman for George Construction Company, went to the turnbuckle to loosen it in order to allow the cable to slack, or drop out of the way of the truss. Stockfelt testified *749 that at this time the crane operator had lifted the second truss two or three feet above the cable and was holding it in that position. All other witnesses, except the crane operator who denied that it ever came into contact with the cable, testified that the second truss remained in contact with the cable until the cable suddenly came loose causing the first truss to fall in the opposite direction.
We must conclude that the preponderance of evidence supports the factual finding that the cable was in contact with the truss and under great stress when Stockfelt attempted to release the turnbuckle. Stockfelt admitted that his attention was being given to the turnbuckle and that his back was toward the truss in question. For this reason his testimony on the question of contact is not as persuasive as that of all the other witnesses. Furthermore, this conclusion is supported by the fact that when Stockfelt had loosened the turnbuckle to the last few threads, it suddenly pulled loose or came apart, thus clearly indicating that the cable was under great stress. The sudden release of the tension on the cable caused the tension on the opposing cable to pull the truss suddenly in that direction, past the point of perpendicular balance, causing it to fall under its own weight. The temporary guy rope was not strong enough to check its fall. In falling, the truss pulled down the supporting columns to which it had been bolted, tearing them out of the concrete foundations. Both Brown and O'Shea were seriously injured as a result of being thrown to the ground from a height of more than 30 feet.
This brings us to a consideration of whether placing the truss on the cable and leaving it there constituted negligence on the part of the crane operator and, if so, whether such negligence was a proximate cause of the accident. Crane operators are highly skilled workmen and are presumed to know of the great hazards involved in the performance of their duties on a steel erection job. We do not think it requires the testimony of an expert engineer to prove the dangers inherent in placing a four-ton truss on a supporting guy cable, but we do have the testimony of George Salvaggio, a graduate engineer, president and part owner of George Construction Company, on this point. Salvaggio testified to the danger in this situation and that such could cause an accident such as that which did occur. Surely the crane operator must have been aware of this fact. Therefore, his placing the truss on the cable and his failure to lift it immediately to a safe position to relieve the stress, a condition within his vision and under his control, was an act of negligence. There probably was a contributing cause the attempt by Stockfelt to loosen the turnbuckle while it was under great stressbut the principal proximate cause was the stress upon the guy cable under the weight of the truss. This condition is chargeable to the crane operator, who alone could have relieved it.
There is no proof that there was any mechanical defect in the crane, and plaintiffs and intervenor have failed to establish any negligence or liability of B & G on this account. Therefore, any right of recovery they may have against B & G must rest wholly on the negligence of its crane operator.
This brings us to a consideration of the second question, namely, the defense that Alvin LaCombe, the crane operator, was the borrowed servant of George Construction Company. This question has given us considerable difficulty, particularly because of the conclusion reached by us in Truitt v. B & G Crane Serv., Inc., supra, in which we held that the crane operator was a borrowed servant under almost identical facts. Our judgment on the first appeal in this case, in which we reversed the summary judgment and remanded this case for trial on the merits, was proper; because every case must be decided upon the facts peculiar to it, and at that stage of the proceeding there was a substantial question of fact which could not be resolved without a full trial. As stated by us in our judgment on *750 the first appeal, it would have been manifestly unjust to deny these plaintiffs their day in court merely because Truitt had failed to prove his case under similar circumstances. Conceivably the plaintiffs might have established a more favorable factual situation.
In the Truitt case, the plaintiff was knocked to the ground by the jib boom of the crane while the load boom was being moved into position to pick up a load of steel. The only factual difference between this case and Truitt is that in Truitt at the time of the accident the crane operator was following directions from the connectors and that Truitt apparently was not visible to the crane operator, whereas, in this case, the crane operator could see the truss and its contact with the guy cable and could also see the workmen on the first truss. This difference bears on the question of the negligence of the operator, not on the question of whether or not he was a borrowed servant. The negligence issue was not decided in Truitt; the decision there was based solely on the finding that Truitt was a borrowed servant. If our conclusion in the Truitt case is correctthat the crane operator was a borrowed servantthen the same conclusion must be reached here.
An accurate description of the procedure of hoisting structural steel by means of a crane was related in the Truitt case as follows:
"The method used in connection with the utilization of the crane in the construction job seems to have been the accepted, normal and customary method in the building trade. The construction work was performed by a `raising' gang. The raising gang was directed and controlled by a `pusher,' an employee of the general contractor. His gang consisted of a `hooker on,' a `tag man,' and two `connectors,' all employees of the general contractor; the operator of the crane and its oiler were also in the pusher's gang. The hooker on was the man who attached the cables around the beams on the ground and to the hook on the crane. The tag man had a rope attached to beams for the purpose of keeping them from unduly swaying and helping to guide a beam to its proper location. The connectors were up in the structure for the purpose of receiving beams and doing whatever was necessary to secure them in their proper position. While the steel was on the ground, directions were given to the crane operator by either the pusher or the hooker on. When materials were to be raised, the directions were transmitted by hand signals by the connectors. If there was necessity to move the crane, the directions were usually given by the pusher. * * *" 165 So.2d at 875.
The lengthy testimony on the subject of direction and control of the crane operator does not indicate that any greater or less control was exercised by the George Construction Company or its employees over the crane operator in the instant case.
We held in the Truitt case that while the crane operator was a regular employee of B & G, paid by B & G, subject to dismissal only by B & G, these facts did not have any effect on his status as a borrowed servant of the general contractor. We said the question is not who can control his general employment, but rather who controls his temporary employment. We concluded that the crane operator was under the absolute supervision and control of the general contractor and that all the operator did was to carry out orders from the employees of the general contractor. We said further:
"From an analysis of the facts and circumstances of the case before us, it is perfectly obvious that (1) the work on which the crane was being used was the work of the general contractor; (2) the operator of the crane had to take and took orders from the general contractor's employees and merely carried them out; and (3) the method of erecting the building was entirely under the control of the general contractor, the lessor of the cranes and the operators having no interest *751 therein. * * *" 165 So.2d at 877.
In Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951), our Supreme Court made an exhaustive examination of the authorities on the subject of borrowed servant and came to the conclusion under the facts of that case that the negligent welder was not the borrowed servant of the general contractor. But in a later case, B & G Crane Serv., Inc. v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955), in which the facts were more closely parallel to those in the instant case, the Supreme Court, after citing Benoit and most of the authorities relied on there, came to the conclusion that the crane operator was a borrowed servant. Both of these decisions were cited and discussed by us in Truitt.
While every case must be determined under the facts peculiar to it, we think there is generally a distinction between the nature of services of a crane operator and a welder. A welder might quite conceivably be directed by the job foreman to carry out a welding operation alone at a remote place, out of the sight and control of all employees of the general contractor, following only very general directions which indicated the work to be done. He then proceeds to do his own work in his own way. On the other hand, it is difficult, if not impossible, to conceive of a situation calling for the services of a crane operator in a steel erection job that does not require cooperation with other employees as a member of a team, where all members take directions from one foreman or gang boss. There is a danger that this distinction, as counsel for plaintiff O'Shea ably points out, might be construed to mean that crane operators would be borrowed servants in every case. We are aware of this danger, and it is not our intention that such meaning be given to the foregoing distinction between welders and crane operators. Similar distinctions might be made between other crafts.
Counsel for intervenor-appellant persuasively argues:
"* * * An employer cannot offer his services to all of the world which by their very nature are wrought with danger and expect our Courts to relieve him of the responsibility for negligence of its employees based upon a technicality that he was merely under the fictitious control of another employer when in effect the work which he is doing is the work of his general employer. * * *"
Counsel for appellants have exhaustively discussed the borrowed servant doctrine and have cited many authorities in their briefs. Most of the authorities cited were considered and discussed by the Supreme Court in the Benoit and Hooley cases, and by this court in the Truitt case. There is nothing to be gained by a further specific reference to the numerous cases cited in those opinions.
Of the three points mentioned by us in the Truitt case and quoted above, the one which gives us the most difficulty here is: "* * * (1) the work on which the crane was being used was the work of the general contractor; * * *." Counsel for appellants have argued with persuasive logic that the business of B & G Crane Service, Inc., is renting cranes and operators and that the work of LaCombe on the job in this case was the work of his master, B & G. True the "work on which the crane was being used" was the work of the general contractor, but the use of the crane on this "work" was the business of B & G, and to the extent that LaCombe was in control of the use and operation of the crane, entrusted to his expert care by his master, B & G, he was the servant of B & G performing its business. We must conclude therefore that LaCombe was engaged in a work or service furthering the interest and business of both George Construction Company and B & G Crane Service, Inc. To this extent, therefore, we might have been in error in the Truitt case in leaving the inference that the crane operator was engaged only in the work of the general contractor.
*752 The question of "whose work" or "whose business" in which the negligent employee is engaged, as one of the tests to be applied in determining if he is a borrowed servant or employee pro hac vice, is of no value in a situation in which he is in the service of both employers. Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614 (1951), a case involving a crane in a factual situation strikingly similar to the one before us, points out the unworkability of the "whose business" test. The Minnesota Supreme Court held that the crucial test was who had the right to control the particular act giving rise to the accident. Applying this test, the same conclusion was reached as that reached by us in the Truitt case.
In the Benoit case, our Supreme Court fully discussed the "whose business" test and the right of control test and said:
"* * * In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. * * *" 53 So.2d at 140.
The conclusion reached by the Court in that case apparently rests upon the application of both tests and a finding of fact to sustain its judgment under either test. In the Truitt case, our conclusion likewise rests upon a finding that both tests have been met but we placed greater importance on the control test saying:
"In the cited cases varying tests have have laid down for determining whether a workman is to be denominated a borrowed servant, but it seems to be now well settled that the most important test to be applied in determining what is the status of the employee is to first find out who controls him in the work he is performing and more particularly who has the power and right to direct him in carrying out his work. * * *" 165 So. 2d at 877.
In the Hooley case our Supreme Court apparently based its conclusion primarily on the "control test" saying:
"Applying the tests laid down in these decisions, and particularly the test upon which all eventually turn, i. e., who controls the servant in the named employment, we have no hesitancy in holding that the crane operator in the instant case was the servant of the defendant, * *" 80 So.2d at 372.
However it also found: "The work on which the crane was used was not the work of the plaintiff, but the work of the defendant."
We have carefully reconsidered our opinion in Truitt to determine if a distinction can be made between that case and the instant one on the question of "control" of the crane operator in the particular work being done at the time of the accident. We are unable to make a distinction and must arrive at the same conclusion we reached in that case, that "the operator of the crane had to take and took orders from the general contractor's employees and merely carried them out." Accordingly, under the application of the "control" test, we must hold that he was a borrowed servant or employee pro hac vice of George Construction Company at the time of the accident in question.
For these reasons, the judgment appealed from is affirmed at appellants' cost.
Affirmed.

ON REHEARING
SAMUEL, Judge.
In this matter we granted a rehearing limited to: (1) the question of whether the crane operator was a borrowed servant or employee pro hac vice of George Construction Company at the time of the accident, a question which concerned us because of the apparent difference in rationale, particularly as to the relative importance of the "whose business" and the "control" tests, *753 between Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137 (1951) and the more recent case of B. & G. Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955), both of which were handed down by the Supreme Court of Louisiana; and (2) in the event we should conclude that the crane operator was not a borrowed servant or employee pro hac vice, the quantum of damages involved.
A careful reconsideration and analysis of the first question convinces us that our original opinion and decree to the effect that the crane operator was a borrowed servant or employee pro hac vice of George Construction Company at the time of the accident are correct and should be reinstated.
Accordingly, our original opinion and decree herein are reinstated as the final judgment of this Court.
Original decree reinstated.