**Junius McKENSIE, Plaintiff,**

v.

**SEA–LAND SERVICE, INC., Defendant.**

**Civ. A. No. 73–656.**

United States District Court,
E. D. Louisiana.

Sept. 4, 1975.

S. E. Gutierrez, Jr., Gutierrez & Mumphrey, Chalmette, La., for plaintiff.

Gerard T. Gelpi, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Sea-Land Service, Inc.

Ralph E. Smith, Deutsch, Kerrigan & Stiles, New Orleans, La., for Atlantic & Gulf Stevedores, Inc.

John O. Charrier, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for B & G Crane Service, Inc.

CASSIBRY, District Judge:

This litigation was commenced by the complaint of the plaintiff Junius McKensie against Sea-Land Service, Inc., (Sea-Land) for personal injuries sustained by him on October 12, 1972 while working as a longshoreman aboard the SL–180, a container vessel owned and operated by defendant Sea-Land. Sea-Land filed third-party complaints against Atlantic & Gulf Stevedores, Inc., [A & G] the employer of McKensie,

and B & G Crane Service [B & G], the owner of the crane being utilized by the stevedores at the time of McKensie's injuries. A & G filed a cross claim against Sea-Land for recovery of compensation and medical expenses paid to McKensie under the Longshoremen and Harbor Worker's Act. A & G and B & G filed cross claims against each other.

McKensie's claim against Sea-Land was compromised for $175,000.00 over and above compensation and medical benefits paid by A & G. All parties other than McKensie reserved their rights and claims against one another, and by agreement of counsel the case on the remaining claims is submitted on depositions and briefs.

 The ship became unseaworthy when a container stacking frame that held a container being offloaded from the deck of the SL–180 was lifted with the container. In a proper unloading situation the containers lifted free of the stacking frames.[1] McKensie was standing on the stacking frame that improperly lifted, fell off of it as it lifted, was pinned underneath it when it fell back and suffered serious injuries. Sea-Land, as owner of the vessel, was liable to McKensie for injuries resulting from this unseaworthy condition. *Seas Shipping v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

Sea-Land contends that it is entitled to be indemnified for the amount paid in settlement, plus interest, costs and attorneys' fees, by A & G and/or B & G under *Ryan Stevedoring Co. v. Pan Atlantic Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) because the accident was caused by the breach of their warranties of workmanlike service. Sea-Land urges that the accident was caused by the neglect of the longshoremen in failing to unlock one of the devices locking the container to the frame; by the failure of the longshoreman flagman to signal the malfunction to the operator of the B

---

1. The condition which allowed the lifting of the container with the stacking frame attached rendered the SL–180 unseaworthy since she was not then reasonably fit for her intended use, *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1961), and the ship was no longer a reasonably safe place for the longshoremen to work, *Lusich v. Bloomfield Steamship Co.,* 355 F.2d 770 (5th Cir. 1966).

& G crane quickly enough to avoid the accident; and by the negligence of the crane operator in lifting the container when he could not see it and when the flagman was not in sight.

A & G contends that the accident was caused by a latent defect in the locking mechanism resulting in the failure of one or more of the locking devices to release when the unlocking lever was operated, and denies that its flagman was negligent.

B & G denies that its crane operator was negligent, and contends, in the alternative, that its crane operator was a borrowed servant of A & G, and A & G is responsible for his negligence.

The cause of the frame lifting with the container was never definitely ascertained by the ship's personnel, A & G or B & G. The case is presented as one for the court to determine by inferences drawn from the facts elicited from the witnesses in the depositions. That task is more arduous because many of the witnesses were confused, or by the time of the depositions had poor recollection of some of the circumstances and events of the night of the accident. The terminology in many instances of the attorneys in questioning the witnesses, and of the witnesses in answering was so ambiguous and unclear that it is impossible at times to determine what was sought to be elicited from the witnesses, and what the witnesses intended to convey by their answers.

The SL–180, a mammoth vessel designed solely to carry containers, was making its first call at the port of New Orleans. It docked at the France Road terminal starboard side to the dock. Sea-Land contracted with A & G to discharge the vessel, and A & G contracted with B & G for the use of a 250-ton mobile crane with a 160′ boom in the discharge operations. A & G had discharged a number of other container vessels, but never one of the class or design of the SL–180.

The design of the vessel and the discharge operation was explained to certain of the A & G personnel by one of the vessel's officers before cargo operations began. Emphasis was given to the mechanism which locked and unlocked the containers on the vessel. The longshoremen understood how to load and discharge the vessel before they commenced work on the vessel.

The vessel has 11 hatches. Standard containers, 35′ and 42′ long, 8′ high and 8′ wide, were carried above and below deck at each of the hatches. Above deck typically three levels of containers were carried at each hatch. Hatches 2 through 11 would accommodate 11 containers from port to starboard with their longest part running from bow to stern. Thus at each of these hatches a total of 33 containers could be loaded above deck.

At each hatch the bottom tier of the above deck containers rested immediately on the hatch covers. Above this lowest group of containers a set of stacking frames was positioned. These stacking frames were designated the port stacking frame and the starboard stacking frame. These two stacking frames were placed side by side, port to starboard, and when in position took up the entire breadth of the cargo area of the vessel. Into this set of stacking frames the containers on the second tier were positioned. Each stacking frame would accommodate five and one-half containers. One side of the middle or sixth container rested on the port stacking frame and the other side rested on the starboard stacking frame. Above this second tier of containers a second set of stacking frames (port and starboard) was positioned. Into these stacking frames the third or highest group of containers were positioned.

The stacking frames were designed with twist locks to secure the containers to the frames. Each end of each stacking frame had 11 twist locks, that is to say, the forward end of the port stacking frame had 11 twist locks. The starboard stacking frame was identically designed—11 twist locks were at each end. These locks were placed so that they would fit into an aperture at each corner of a container. When the locks were closed they held the containers securely in position.

The middle or sixth container in the second and third tiers was secured by locks on the forward and after ends of the port stacking frame and by locks on the forward and aft ends of the starboard stacking frame. As pointed out previously this middle container on each tier rested on both the port and starboard stacking frames.

The stacking frames were so designed that a single lever at the outboard side of each would open or close the entire 11 twist locks at each end of the frame. Thus to completely lock or unlock one tier of containers above deck a total of four levers had to be thrown—the port aft and port forward, the starboard aft and starboard forward.

Each twist lock consisted of a vertical steel shaft with a "T" welded across the top. The underside of each container had an oval shaped socket to receive the "T" head of the locking pin. When the container was in place on the frame, the "T" fitted into the corresponding slot in the socket, in a fore and aft position. The shaft was keyed to a mechanical linkage inside the transverse portion of the frame, on the forward and after ends. To secure the containers the pins were rotated mechanically by the remote levers through an arc of 90 degrees, which movement caused the "T" head of the lock to tighten down in the socket, the head perpendicular to the slot. The pressure of the lock in the socket held the containers securely to the frame.

The containers were removed from the vessel by a crane and placed on a truck chassis on the dock. The length of the containers required employment of bridles designed specifically for 35′ containers and 42′ containers. The bridle consisted of a rectangular spreader with mechanical securing devices. The spreader was designed to fit over the top of the container and was secured to fittings on the container by the crane operator.

About four o'clock in the afternoon of the 12th discharge operations at hatch No. 11 were commenced by A & G's longshore gang of 18 or 19 members under the supervision of foreman Murphy Bowman and the stevedoring ship superintendent Steve Pfeiffer, with the assistance of two crane operators, Richard T. Smith and Earl LaCoste who operated the crane on an hourly rotating basis. Charles Bitzer, Marine Manager of Gulf-Puerto Rico, Inc., Sea-Land's New Orleans' agent, initially advised A & G and B & G personnel as to the order of discharge of hatches, but thereafter neither he nor any member of the crew of the vessel played any part in the discharging.

The routine followed for the discharging and loading operation was as follows:

(1) The container spreader bar was swung by the crane from the dock to the container designated by the longshoremen as the next to be picked up;

(2) When the spreader bar arrived in the area of the container which was to be picked up, the flagman would give signals to the crane operator as to the exact positioning of the spreader bar so that it could be locked into the container;

(3) When the spreader bar had been correctly positioned the flagman signaled the crane operator to lock in the spreader bar, which was accomplished by throwing a switch in the cab of the crane activating twist locks in the spreader bar connected to the top of the container;

(4) When the longshoremen had determined that the spreader bar was locked in, a signal was given by the flagman to the crane operator to pick up the container and take it away;

(5) Should the load begin to come up unevenly or unlevel, the flagman would then stop the crane operator and signal him to level the container. The crane was equipped with two falls so that either end of the container could be raised as needed. Once level, the flagman would flag the operator to take it away and the container would be lifted up by the crane and swung to the dock;

(6) On the dock a truck and truck chassis would be waiting to receive the con-

tainer. The crane operator would bring the container to the area of the chassis and he would then be flagged by longshoremen on the dock so that the container could be placed in position on the chassis of the truck and locked in;

(7) If containers were going both on and off, a container would be picked up from the dock and swung aboard the ship. If no container was going aboard the ship, the crane operator would swing the empty spreader bar back aboard the ship to the container designated by the longshoremen and the process would began anew.

Although the longshore gang consisted of eighteen members, only five, and possibly six, of the gang members, actually worked aboard the ship. The men were assigned, or took up, certain positions as the work progressed. Thus, the crew and the positions they held aboard the ship were as follows:

(1) Junius McKensie, the now deposed plaintiff, worked the after end of each container;

(2) Douglas Turner, another longshoreman, worked the after end of each container with McKensie;

(3) Lawrence E. Clark, another longshoreman, worked the forward end of each container;

(4) Nelson Richard, another longshoreman, worked the forward end of each container with Clark.

(5) Cornelius Bradley, another longshoreman, served as flagman or derrickman. His function was to coordinate the lowering, the locking in, leveling, and picking up the container from the ship and to give the crane operator the signal as to each of these;

(6) Murphy Bowman was the longshore gang foreman. He supervised those on the ship and the members of the gang working on the dock, moving back and forth between the ship and the dock.

The work proceeded slowly but uneventfully except for some difficulty in keeping the crane in operation, and the discharge of 21 containers above deck at hatch No. 11 was completed in approximately five hours. The crane was then shifted to hatch No. 6 for discharge of the three containers on that hatch, one above the other at the center line. The crane was on the dock slightly forward or aft of the hatch and the cab of the crane was 35 feet above the dock at a level near the top of the second tier of containers.

Smith had just commenced his hour of crane operation. Guided by flagman Bradley, Smith positioned the lifting frame over the single container on center line in the top tier of hatch No. 6, secured the lifting frame to the container on Bradley's signal and lifted the container from the stacking frame. On Bradley's next signal Smith swung it ashore to the waiting trailer chassis. Thereafter, he lifted the empty upper stacking frames which supported the top tier and placed them on the dock.

Smith then brought the lifting frame to a point above the container in the middle tier on center line at No. 6. This container rested on the lower stacking frames. Since it was on center line, this container had been locked at its corners, forward and aft, to both the port and starboard stacking frames. When given the signal by Bradley that the longshoreman with the tag lines had brought the frame exactly into place, Smith lowered and locked the lifting frame to the container. Upon signal from Bradley, Smith commenced lifting. Bradley moved forward out of the way from his position starboard side forward of the container. Turner and McKensie (working at the after end), and Richards and Clark (working the forward end) had moved outboard from the center line container. McKensie and Turner were standing on a catwalk on the port stacking frame at the after end. The port stacking frame was lifted with the container. McKensie fell and Smith stopped the lift as soon as he saw the frame lift with the container. The container had been lifted 5 or 6 or as much as 8 feet before he saw it. The frame fell

back and pinned McKensie between the catwalks on hatches 6 and 7. As soon as Bradley realized the frame was lifting with the container he gave a stop signal but Smith stopped the lift because he saw the frame himself—not on Bradley's signal.

The operation shut down for the night and the longshoremen's attention was directed to releasing McKensie from the frame and getting him to the hospital. Alton Barber, the ship's night relief officer, was in the ship's galley at the time of the accident. He was told the forward port lock had not released and he examined the lock with a flashlight about 11:30 P.M., shortly after the accident, and he saw nothing broken or wrong with the gear. Charles Bitzer, the marine manager for Sea-Land, went out to the accident and examined the frame and found one twister lock broken off at the shank. He recalled that it was the forward starboard corner. He did not find the "T" top, all that was left was the shaft. Earl LaCoste, the relief crane operator, checked the frame at the time of the accident and found a bent lock on the outboard frame. It was "beginning to break", and "it was already cracked".

After the frame was on the dock Stephen Pfeiffer observed a locking pin on it that was bent—the shaft of the lock was bent—but he could not say that was the twist lock involved in the accident, and he gave no indication that the "T" top was missing. The morning after the accident the ship's chief mate told Charles Boyle, the boatswain, to repair a broken twist lock. Boyle recalled that it was on one of a stack of four frames at the No. 2 hatch. He had no way of connecting it with the accident—he could not remember which frame or which corner. The locking head was gone and he did not find it. He could not identify the lockingpin with the missing "T" head which was presented to him at his deposition as the one he replaced that morning. The "T" head was welded with two tack welds. He often repaired the locks, when the heads were broken off and they all looked alike to him.

Murphy Bowman, the foreman, examined the frames considered to be the hatch No. 6 frames the next day after they had been removed to the dock. The stacking frame that lifted had only three pins, one pin was missing from the rack. The mate had the broken pin on the ship, but he did not see it—he only saw that the pin was missing from the rack. Smith, the crane operator, examined the forward end of the stacking frame on the dock the next evening after the accident. One pin was broken—not broken "clean off"—just cracked or bent over on the "flat side of the dog".

Smith testified also that the forward end of the port stacking frame was hooked to the container when he lifted it and Bradley was definite in his testimony that the whole stacking frame came up caught on the forward port corner.

■ The most reasonable explanation of the accident from the evidence is that the forward lock on the port stacking frame did not release to allow the container to be lifted free of the frame. `The cause of the failure to release was not determined and is unknown. Sea-Land contends that the preponderance of the evidence creates the inference that the longshoremen failed to operate the lever to unlock the twist locks on the forward end of the port frame. A & G suggests that there are many possible explanations of the failure of the lock to release: defective alignment of the container with the lock; the key linking the shaft to the mechanical linkage was not in the keyway or it had sheared off; the shaft of the locking pin was bent; the pin was loose; or the frame may have been out of alignment.

The difficulty with drawing the inference urged by Sea-Land is that the testimony of Bowman, Bradley, Turner and McKensie permits no conclusion other than that they thought the levers in the middle tier were put in the unlock position before they commenced unloading the container on the middle tier. Pfeiffer testified that after McKensie was moved he checked all four levers and they were unlocked. Sea-Land

contends McKensie testified as to only one lever being pulled at the forward end because he used the singular, not the plural, *lever.* He also used the singular *lever* when he spoke of the pulling of the forward *lever* for the top frame so that if this narrow interpretation of his testimony were indulged in, the frame for the top tier should have come up with the top container. A reading of McKensie's testimony as a whole allows no interpretation that he was intending to convey that one or more of the levers had not been pulled.

Sea-Land also urges the inference should be drawn because the two longshoremen working the forward end were not deposed by A & G. No explanation is offered by any party as to why Richard and Clark were not deposed except that A & G says their testimony would merely have been cumulative. Richard was still employed by A & G and there is no suggestion that Clark was unavailable. These persons were equally available to all parties. Moreover, Bradley testified that he saw the forward levers thrown before the discharging on the middle tier was commenced.

The contention that Bradley was negligent was not sustained by the evidence. Bradley was standing starboard side of the container forward. The container was to be moved starboard for discharge. Bradley would have been negligent and would not have been using reasonable care for his own safety if he had not moved back out of the way the container was to be discharged.

He gave the stop signal as soon as he saw the frame lifting. The accident happened quickly and Sea-Land has failed to prove by a preponderance of the evidence that he did not act reasonably under the circumstances.

The charge that the crane operator was negligent in lifting the container when he could not see it is not sustained. The flagman was used because the crane operator could not see the operation well enough to operate the crane effectively without direction. When Bradley gave him the signal to lift the container it was reasonable under the circumstances of their procedure for him to lift until he was given a contrary signal or until he became independently aware of some difficulty. There is no evidence that he did not stop as soon as he saw the frame was lifting with the container. The port frame was across the container from his cab crane so that he could not see immediately that it was lifting, and there is no suggestion that he should have seen it sooner.

■ If Smith had been negligent, B & G would not be responsible for that negligence. A & G employees directed his every action in the discharging operation. The control they exercised over his activities made him the borrowed servant of A & G under *Ruiz v. Shell Oil Company,* 413 F.2d 310 (5th Cir. 1969).[2]

■ For these reasons Sea-Land is not entitled to indemnity from A & G or B & G and its third-party claims against them are dismissed. All other claims are dismissed also, except A & G's cross claim for workmen's compensation paid to Junius McKensie in the amount of $4,581.00 and medical expenses paid on his behalf in the amount of $9,877.30.

The Clerk shall prepare judgment accordingly.

---

2. See *Truitt v. B & G Crane Service, Inc.,* 165 So.2d 874 (La.App.1964); *Brown v. B & G Crane Service, Inc.,* 194 So.2d 746 (La.App. 1967) and *B & G Crane Service, Inc. v. Thomas W. Hooley & Sons,* 227 La. 677, 80 So.2d 369 (1955) for detailed discussions of the borrowed servant theory as applicable to cranes and crane operators.