**Albert Paul EFFERSON, et ux**

v.

**KAISER ALUMINUM & CHEMICAL CORPORATION, et al.**

**Civ. A. Nos. 91–3326, 92–2959.**

United States District Court,
E.D. Louisiana.

Jan. 29, 1993.

Stephen Barnett Murray, Murray Law Firm, New Orleans, LA, Gordon R. Crawford, Gordon R. Crawford & Associates, Gonzales, LA, for Albert Paul Efferson and Mary Ann Efferson.

Antonio E. Papale, Jr. (argued), Hailey, McNamara, Hall, Larmann & Papale, Muriel O. Van Horn (argued), Lenfant & Associates, Metairie, LA, for Aetna Cas. and Sur. Co.

Jeffrey Allen Raines, Alan Robert Sacks, Sacks & Eason, Metairie, LA, C. William Bradley, Jr., John D. Ryland, Lemle & Kelleher, New Orleans, LA, for Kaiser Aluminum and Chemical Corp., Robert Ginn and Jack Carmena.

Campbell Edington Wallace, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, LA, Antonio E. Papale, Jr., Hailey, McNamara, et al., Metairie, LA, for Subsidiary of AKM, Inc., and Volks Constructors.

Edward Francis Lebreton, III, Cindy Teresa Matherne, Rice, Fowler, Kingsmill, Vance, Flint & Booth, New Orleans, LA, for Baloise Ins. Co. of America.

James Clayton Davie, Jr. (argued), Charles McLean Carr, III, McAlpine, Peuler, Cozad & Davie, New Orleans, LA, for Certain Underwriters, subscribing to Excess P & I Policy GCM–14044.

## MEMORANDUM AND ORDER

SEAR, Chief Judge.

Plaintiffs—Albert Paul Efferson ("Efferson")[1], individually and as administrator of the estates of his minor children; and Mary Ann Efferson, wife of Albert Efferson—originally brought this action in state court against defendants Kaiser Aluminum & Chemical Corporation ("Kaiser") and two of Kaiser's employees. The plaintiffs' claims arise from injuries allegedly sustained by Efferson while working at the Kaiser plant dock in Gramercy, Louisiana. In September of 1991, Kaiser removed this action from state court, invoking the Court's diversity jurisdiction.[2]

Subsequent to removal, plaintiffs were granted leave to file an amended complaint naming Volks Constructors ("Volks") as an additional party defendant. Volks is a Louisiana corporation and was Efferson's employer at the time of the accident.[3] Plaintiffs asserted a maritime tort claim against Volks, and bring the claim pursuant to § 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.*

A number of motions have been filed or re-urged. Defendant Kaiser has re-urged its previously filed motion for summary judgment. Defendant Volks has re-urged its previously filed motion for summary judgment.[4] Four of Volks alleged insurers have filed cross motions for summary judgment. Finally, plaintiffs have filed a motion for a jury trial pursuant to Rule 39(b) of the Federal Rules of Civil Procedure.

*Factual Background*

The basic factual background of this action is not contested by the parties. At the time of the accident, Efferson was a welder employed by defendant Volks. Volks was hired by defendant Kaiser to perform certain repairs at its dock facilities in Gramercy. Among other things, Volks was hired to replace timbers that were attached to the face of Kaiser's dock; these timbers acted as a fender to protect the dock.

Volks used two flat-deck barges, the CP4 and the KS412, during the course of the repairs. A mobile crane was placed onto the KS412, and various equipment and supplies, including the timber that was to be attached

---

1. References to "Efferson" are references to Albert Paul Efferson unless otherwise indicated.

2. By order entered on February 25, 1992, my Brother Mentz denied plaintiffs' first motion to remand on the ground that plaintiffs had fraudulently joined Kaiser's non-diverse employees.

3. By Memorandum and Order entered on September 21, 1992, I denied plaintiffs' second motion to remand on the ground that jurisdiction over this case exists under 28 U.S.C. § 1333 and 28 U.S.C. § 1367.

4. Volks' motion is entitled "Motion to Dismiss and Alternatively, Motion for Summary Judgment." The motion is treated as a motion pursuant to Rule 56 since disposition of the motion requires me to look outside of the pleadings.

to the dock's face, were placed onto the CP4. The two barges were then transported to Kaiser's dock and lashed to each other and to the dock.

Some time before the accident, a portable aluminum ladder was extended from the deck of the CP4 to the face of the dock and tied off. Near the top of the ladder, near to the face of the dock, was a steel "H" beam. A number of steel posts, or angle irons, protruded from the beam. On the morning of November 21, 1990, as he was preparing to descend down the ladder to the CP4, Efferson grasped one of the angle irons protruding from the "H" beam. The angle iron broke off and Efferson fell from the dock onto the CP4.

Plaintiffs' complaint[5] alleges that either Kaiser, Volks, or both are liable to plaintiffs. Plaintiffs seek damages from Kaiser under theories of negligence and strict liability, Complaint, ¶ 18; damages from Volks are sought only under negligence, Complaint, ¶ 27.

*Dismissal of Robert Ginn and Jack Carmena*

Kaiser moves for the dismissal of Robert Ginn and Jack Carmena from this action on grounds that plaintiffs have no cause of action against these individual defendants. None of the parties oppose the dismissal of Ginn and Carmena.

By order entered on February 20, 1992, my Brother Mentz denied plaintiffs' first motion to remand on grounds that plaintiffs had fraudulently joined Ginn and Carmena: "The defendants have satisfied their burden of showing that the plaintiffs have no possible cause of action against [Ginn and Carmena]." Order entered February 20, 1992, p. 2–3 (*citing B., Inc. v. Miller Brewing Co.*, 663 F.2d 545 (5th Cir.1981)).

Accordingly, the claims against Robert Ginn and Jack Carmena are dismissed.

---

**5.** Plaintiffs filed an original complaint, which alleged claims against Kaiser, and a first amended complaint, which alleged claims against Volks.

**6.** Facts marshalled in support of a motion for summary judgment can only be those that would otherwise be admissible at trial. Fed.R.Civ.P.

*Kaiser's Motion for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue* as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added).[6] When a *moving party* satisfies the requisites of Rule 56(c), a motion for summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The inferences drawn from the underlying facts, however, must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Finally, the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Kaiser advances a number of arguments in support of its motion for summary judgment. First, Kaiser asserts that Efferson is covered under the Louisiana Worker's Compensation Act, La.Rev.Stat.Ann. § 23:1021 *et seq.* (West 1985 and 1992 Supp.). Consequently, Kaiser argues that it is Efferson's statutory employer and that compensation is Efferson's exclusive remedy against Kaiser. Second, Kaiser contends that it cannot be held liable for the negligence of Volks, an independent contractor. Third, Kaiser claims that it cannot be held strictly liable since Efferson's injuries were not caused by an unreasonably dangerous condition.

---

56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). The Federal Rules of Evidence, of course, govern admissibility.

## A. Louisiana Worker's Compensation Act

The Louisiana Worker's Compensation Act, La.Rev.Stat.Ann. § 23:1021 *et seq.*, is the exclusive remedy of covered employees against their employers. La.Rev.Stat.Ann. § 23:1032(A)(1)(a).[7] Like most workers' compensation acts, Louisiana's act provides covered employees with an expeditious no-fault statutory remedy for work related injuries. In exchange, workers relinquish their common law remedies—or, as in the case of Louisiana, their other civil law remedies—against the employer.[8]

■ The term "employer," for purposes of the Louisiana statute, may include entities other than an employee's immediate employer. Specifically, under § 23:1061 of the act, employees of subcontractors[9] under certain circumstances are considered to be employees of the contractor for purposes of the act.[10] La.Rev.Stat.Ann. § 23:1061.

■ Kaiser asserts that although it did not directly employ Efferson, it is Efferson's "statutory employer" under the Louisiana statute and consequently is not liable for anything other than the remedies provided for in the statute. Plaintiffs and Volks both contend that since Efferson may seek compensation pursuant only to the federal Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, Kaiser is immune from a tort suit only if Kaiser is an "employer" as defined by LHWCA.[11] Under LHWCA, a contractor is an "employer" of a subcontractor's employee only if the subcontractor fails to secure the payment of compensation as required by LHWCA. 33 U.S.C. § 905(a).

If Efferson is eligible for compensation under LHWCA, then he cannot seek compensation under the Louisiana Worker's Compensation Act. La.Rev.Stat.Ann. § 23:1035.2[12] ("No compensation shall be payable in respect to the disability or death of any person covered by ... the Longshoremen's and Harbor Worker's Compensation Act, or any of its extension ...").[13] In order to be covered by LHWCA, Efferson must meet both a situs test, 33 U.S.C. § 903(a), and a status test, 33 U.S.C. § 902(3).[14]

---

**7.** La.Rev.Stat.Ann. § 23:1032(A)(1)(a) states,

The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal, for said injury, or compensable sickness, or disease.

**8.** The Louisiana Worker's Compensation Act does not provide immunity for intentional acts. La.Rev.Stat.Ann. § 23:1032(B).

**9.** Unfortunately, differences in terminology between the federal and Louisiana statutes creates some confusion when determining whether a party is an "employer" for purposes of statutory tort immunity. The typical situation involves entity A, who hires entity B to do a certain task; entity B then hires employee X. At issue is whether A is X's "employer" for purposes of the statute. The Louisiana Worker's Compensation Act refers to A as a "principal" or "owner," and refers to B as a "contractor." The federal Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.*, refers to A as a "contractor" and B as a "subcontractor." For purposes here A is referred to as a "contractor" and B is referred to as a "subcontractor" when either the state or federal statute is discussed.

**10.** If an employee covered by the Louisiana Worker's Compensation Act seeks compensation from the statutory employer as defined in § 23:1061(A), then the statutory employer can seek indemnity from the entity otherwise liable to pay compensation. La.Rev.Stat.Ann. § 23:1061(B).

**11.** The LHWCA is the exclusive remedy of covered employees against their employers. 33 U.S.C. § 905(a) ("The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee ..."). However, § 905(b) of LHWCA does allow the employee to sue the employer *qua vessel* in admiralty if the injury to the employee was caused by the negligence of a vessel.

**12.** The effective date of La.Rev.Stat.Ann. § 23:1035.2 is January 1, 1990. Kaiser concedes that the accident at issue occurred after January 1, 1990. *See* Memorandum in Support, p. 1.

**13.** *See also Grantham v. Avondale Industries*, 964 F.2d 471, 473 (5th Cir.1992) (rehearing granted).

**14.** Additionally, in order for Efferson to qualify for LHWCA compensation, he must have been injured in the course of employment, 33 U.S.C. § 902(2), and Volks must have a least some employees who are employed in maritime employ-

In order to satisfy 33 U.S.C. § 903(a), the injury for which compensation under LHWCA is sought must have occurred "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." Kaiser's own "Statement of the Case" and statement of uncontested material facts indicate that at the very least a genuine issue of material fact exists regarding whether Efferson's injury meets the situs test of § 903(a). For example, Kaiser states, "[Efferson's] accident occurred as [he] was attempting to board a barge by climbing down a ladder which was tied to a drift fender structure connected to Kaiser's dock." Kaiser's Memorandum in Support, p. 1; *see also* Deposition of Albert Efferson, pp. 33, 34, and 53, Exhibit B attached to Kaiser's Memorandum in Support. "Kaiser's dock is used by Kaiser on a daily basis to offload bauxite from ships." Kaiser's Memorandum in Support, p. 4; *see also* Deposition of Michael Miles, p. 3, Exhibit D attached to Kaiser's Memorandum in Support.

In addition to the situs test, an employee must be engaged in certain qualifying activities in order to be eligible for compensation under LHWCA. 33 U.S.C. § 902(3) ("The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker ...."). The Supreme Court has held that LHWCA's coverage is to be liberally construed and that "all those on the situs involved in the essential or integral elements of the loading or unloading process" qualify for compensation. *Chesapeake and Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989) (*citing Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 267, 268, and 271, 97 S.Ct. 2348, 2358,

2359, and 2361, 53 L.Ed.2d 320 (1977)). The Supreme Court observed that

> Although we have not previously so held, we are quite sure that employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by [LHWCA]. Such employees are engaged in activity that is an integral part of and essential to those overall processes. That is all that § 902(3) requires.

*Chesapeake*, 493 U.S. at 47, 110 S.Ct. at 385.

*Chesapeake* involved repairmen who where injured while repairing machinery used to load coal from railroad cars onto ships. *Id.* at 43, 110 S.Ct. at 383. The Supreme Court overruled a decision by the Virginia Supreme Court and held that the workers were covered under LHWCA. *Id.* at 48, 110 S.Ct. at 386. ("The determinative consideration is that the ship loading process could not continue unless the retarder that Goode worked on was operating properly."). Even routine maintenance not immediately required for the continuation of the loading and unloading process can qualify as an essential function covered by LHWCA. *Id.* ("Equipment cleaning that is necessary to keep machines operative is a form of maintenance and is only different in degree from repair work."). It is uncontested that Efferson was engaged in the repair of Kaiser's dock when he was injured. If a dock is not an essential or integral element of the loading or unloading process, nothing is. Kaiser has not shown that there is no genuine issue of material fact that Efferson does not meet the status test of LHWCA.

Furthermore, assuming that LHWCA does apply to Efferson's injury, Kaiser has not shown that it is an "employer" within the meaning of the act. Specifically, Kaiser has not submitted any evidence showing that its subcontractor (i.e. Volks, Efferson's direct employer) failed to secure payment of compensation as required by LHWCA.[15] 33

---

ment, 33 U.S.C. § 902(4). Although it does appear the Efferson was injured in the course of his employment, no party has addressed the issue of whether Volks has employees who are employed in maritime employment.

15. Kaiser also could be considered to be Efferson's employer for purposes of LHWCA if Efferson were Kaiser's "borrowed servant" at the time of the accident. *Ruiz v. Shell Oil Company*, 413 F.2d 310, 312 (5th Cir.1969). However, Kaiser has not indicated to the Court any facts

U.S.C. § 905(a). Indeed, it appears that compensation of some kind has already been paid to Efferson by Volks' insurer. Aetna's *Complaint of Intervention*, filed July 21, 1992; *see also* Complaint, ¶ 13 ("[Efferson] at all times prior to the accident herein was covered by the [LHWCA] and has been receiving benefits thereunder.").

## B. Kaiser's Liability for Volks' Negligence

Kaiser asserts that it is not liable for the negligence of Volks, which Kaiser claims is an independent contractor. I do not determine this issue here since Kaiser's argument does not address the allegations in plaintiffs' complaint. The complaint alleges that *Kaiser* was negligent, not simply that Kaiser is responsible for Volks' negligence under the theory of *respondeat superior.* Complaint, ¶¶ 1–19. As an alternative, of course, plaintiffs allege that Volks was negligent as well. Complaint, ¶¶ 20–27. Kaiser does not address plaintiffs' allegations that *it* was negligent.

## C. Kaiser's Strict Liability and Negligence

Plaintiffs' claims against Kaiser for negligence [16] and strict liability [17] hinge on whether the angle iron that failed posed "an unreasonable risk of harm to the plaintiff." *Oster v. Dept. of Transp. & Development,* 582 So.2d 1285, 1288 (La.1991). The Louisiana Supreme Court observed that when a plaintiff is suing for the allegedly defective condition, or vice, of a property under both strict liability and negligence, "the analysis the courts utilize when applying the two theories is similar."

Under either theory, the plaintiff must prove 1) the thing which caused the damage was in the custody of the defendant; 2) the thing contained a "defect" (i.e., it had a condition that created an unreasonable risk of harm to the plaintiff); and 3) the "defective" condition of the thing caused the plaintiff's injuries. *Sistler v. Liberty Mutual Insurance Company,* 558 So.2d 1106 (La.1990). In essence, the only difference between the negligence theory of recovery and the strict liability theory of recovery is that the plaintiff need not prove the defendant was aware of the existence of the "defect" under a strict liability theory. Under the negligence theory, it is the defendant's *awareness* of the dangerous condition of the property that gives rise to a duty to act. Under a strict liability theory, it is the defendant's *legal relationship* with the property containing a defect that gives rise to the duty. *Loescher v. Parr,* 324 So.2d 441, 446 (La.1976). Under both theories, the absence of an unreasonably dangerous condition implies that absence of a duty on the part of the defendant.

*Id.* (original emphasis).

In *Ladue v. Chevron, U.S.A., Inc.,* 920 F.2d 272 (5th Cir.1991) (Rubin, J.), the Fifth Circuit, applying Louisiana law, held that a property owner cannot be held strictly liable when a workman is injured by the very condition the workman was hired to repair. In *Ladue* the plaintiff's employer had been hired by the defendant, Chevron, to replace the deteriorating deck grating on Chevron's oil and gas platform. The plaintiff was standing on grating that was about to be

---

demonstrating that Efferson was Kaiser's borrowed servant. *See Id.; McKensie v. Sea–Land Serv., Inc.,* 430 F.Supp. 6 (E.D.La.1975), *aff'd,* 551 F.2d 91 (5th Cir.1977). In fact, Kaiser has devoted much of its energies arguing that Volks' is an independent contractor, an argument facially inconsistent with the position that Efferson was Kaiser's borrowed servant. Kaiser's Memorandum in Support, pp. 12–15; Kaiser's Supplemental Memorandum in Support, pp. 3–6.

**16.** La.Civ.Code Ann. art. 2315 (West 1992 Supp.) states,

> Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

**17.** Strict liability in this case is governed by two articles of the Louisiana Civil Code. Article 2317 provides that

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....

La.Civ.Code Ann. art. 2317 (West 1979). Article 2322 states,

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.

La.Civ.Code Ann. art. 2322 (West 1979).

replaced when the grating broke loose. The plaintiff sustained injuries in his efforts to avoid falling into the water approximately seventy feet below. *Id.* at 273.

In a very well reasoned opinion by the late Judge Alvin B. Rubin, the Fifth Circuit held that, as a matter of Louisiana law, "the risk posed by the deteriorated grating [was not] unreasonable as required by both Articles 2317 and 2322." *Id.* at 277. The court concluded that it would be perverse to hold an owner strictly liable for the injuries of a worker hired to repair the very condition that caused the injuries. *Id.* at 277–278 ("That incentive [to repair a potentially dangerous condition] would be destroyed if owners are held strictly liable when repairmen are injured by the very condition they are hired to repair.").[18]

Kaiser contends that because Efferson was injured by a condition he was hired to repair, Kaiser cannot be strictly liable under Louisiana law as interpreted by the Fifth Circuit in *Ladue.* At deposition, Kaiser's corporate representative, Michael J. Miles, stated,

A: ... It was my general directive to [Volks], being that they were on time and material, replacing members that had become rusted or damaged in some fashion, to remove what I call those types of items as well, when they passed by them.

Q: So while Volks was working, if they came across unused angle irons, they should have removed them, based on your directions to them; is that correct?

A: If they found them and they were of no use, they would cut them off, scrap them.

Deposition of Michael J. Miles, p. 75, Exhibit C attached to Kaiser's Memorandum in Support; *see also* Affidavit of Michael J. Miles, p. 2, Exhibit E attached to Kaiser's Memorandum in Support. Kaiser also asserts that the angle iron served no useful purpose. Affidavit of Michael J. Miles, p. 2, Exhibit E attached to Kaiser's Memorandum in Support.

However, Volks' superintendent Earl McDonald states in his deposition that he believed his instructions were to remove old angle irons if they were in the work area *and* in the way of Volks' work. Deposition of Earl McDonald, p. 74, Exhibit 1 attached to Volks' Supplemental Memorandum in Opposition. McDonald's testimony indicates that it is unclear whether Volks was *required* to remove "useless" angle irons. *Id.* pp. 72–75. Indeed, Kaiser concedes that "[r]emoval of the angle iron on top of the drift deflector was not one of the items listed in the scope of work under the contract." Plaintiffs' Supplemental Memorandum in Opposition, p. 3.

More importantly, unlike the circumstances in *Ladue,* where the plaintiff was injured by the specific hazardous condition known to the plaintiff, *see Ladue,* 920 F.2d at 273 ("[plaintiff's employer] was told by Chevron that the gratings were rusted and in poor condition"), there is no evidence that the potentially dangerous condition of the angle iron was known to either Efferson or Kaiser before Efferson's injury.[19] Kaiser suggests that removal of the angle iron was within the scope Efferson's work because Volks, by contract, allegedly had a duty to inspect the work area and report any additional items that required repair, including corroded,

18. The court noted that the determination of whether a particular condition poses an unreasonable risk of injury is similar to the duty-risk analysis for negligence. *Ladue* 920 F.2d at 275 (*citing Entrevia v. Hood,* 427 So.2d 1146, 1148 (La.1983)). The court stated that the unreasonableness of the risk is subjective and is determined with respect to the specific plaintiff and circumstances of the case. *Id.* at 277 (*citing Brown v. Sears, Roebuck & Co.,* 514 So.2d 439, 445 (La.1987) (Cole, J., concurring)). *How* a court should go about determining the unreasonableness of a risk is, to say the least, somewhat unclear. The court in *Ladue* stated that "it is necessary for the judge, in shaping his decision about how the law applies to the facts, to consider the particular situation from the same standpoint as would a legislator regulating the matter." A court must consider "the moral, social and economic values [involved] as well as the ideal of justice in reaching an intelligent and responsible decision." *Id.* at 275 (*citing Entrevia,* 427 So.2d at 1149).

19. Kaiser sought repair of the dock because a survey conducted in 1989 by Lamy Chopin indicated a substantial amount of corrosion of the steel members of the dock. Whether this included the particular angle iron at issue has not been addressed by the parties.

**1112**

cracked and insufficient welds. Affidavit of Michael J. Miles, p. 2, Exhibit G attached to Kaiser's Supplemental Memorandum in Support. *See also* Exhibit S attached to Kaiser's Supplemental Memorandum in Support.

■ I conclude that there is distinction between an injury caused by a defective condition previously known to the plaintiff, and the situation presented here, where plaintiff only learned of the allegedly defective condition when he sustained his injury. Furthermore, Volks' alleged duty to report items that required additional repair is derived from a boilerplate form that appears to have been only incorporated into the list of specific tasks Volks was hired to complete. Exhibits S and X attached to Kaiser's Supplemental Memorandum in Support. Therefore, I find that *Ladue* does not control plaintiffs' claim against Kaiser.[20]

Accordingly, I find that genuine issues of material fact exist as to whether the angle iron posed an unreasonable risk of injury to Efferson.

*Volks' Motion for Summary Judgment*

Defendant Volks argues that admiralty jurisdiction does not exist to support plaintiffs' § 905(b) claim.[21] In the alternative, Volks contends that even if admiralty jurisdiction is present, the structure in question, the CP4, is not a "vessel" within the meaning of § 905(b).[22] Since the status of the CP4 affects both the statutory and jurisdiction issues, it is examined first.

A. Vessel Status

Even if plaintiffs' claim against Volks falls within this Court's admiralty jurisdiction, plaintiffs' § 905(b) claim may proceed only if

plaintiff is suing Volks *qua vessel. See* 33 U.S.C. § 905(a); *Richendollar v. Diamond M Drilling Co., Inc.,* 819 F.2d 124, 128 (5th Cir.) (en banc), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987) ("[t]he sine qua non of § 905(b) statutory liability for vessel negligence is the presence of a vessel which admiralty regards as a separate entity distinct from its owner.").

The Fifth Circuit has previously adhered to the statutory definition of "vessel," 1 U.S.C. § 3: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *See Burks v. American River Transportation Company,* 679 F.2d 69, 75 (5th Cir.1982). However, caselaw has grafted onto this statutory definition a number of exceptions. For instance, in *Davis v. Cargill, Inc.,* 808 F.2d 361, 362 (5th Cir.1986), the court held that a surplus dry cargo barge, even though capable of navigation, was not a "vessel" within the scope of § 905(b) since it effectively had been converted into a moored dry dock.[23] *See also Ducrepont v. Baton Rouge Marine Enterprises, Inc.,* 877 F.2d 393 (5th Cir. 1989).

In *Richendollar* the Fifth Circuit held in addition to meeting the statutory definition of "vessel" as stated in 1 U.S.C. § 3 and interpreted by caselaw, a structure must also qualify as a vessel under general maritime law in order to be a vessel for purposes of § 905(b). 819 F.2d at 128 ("We have concluded that the DON E. McMAHON was not a vessel for purposes of admiralty jurisdiction. That conclusion forecloses Richendollar's maritime tort claim, for if the DON E. McMAHON is not a vessel for purposes of admiralty jurisdiction, it is not a vessel for

---

20. Whether or not the angle iron posed an unreasonable risk of harm to Efferson even though it was not a condition Efferson was hired to repair is a question I do not reach here.

21. Absent admiralty jurisdiction, a § 905(b) claim is not cognizable in federal court. *Richendollar v. Diamond M Drilling Co., Inc.,* 819 F.2d 124, 128 (5th Cir.) (en banc), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987).

22. 33 U.S.C. § 905(b) states, "In the event of injury to a person covered under this chapter by the negligence of a *vessel* ..." (emphasis added).

23. The court observed that the barge had "been converted for use as a permanently moored platform from which painting and sandblasting services are provided to barges and is no longer designed or used for navigation. The platform is anchored to the riverbed, and is moved only once or twice a year to compensate for tide changes, and even then, according to Davis' brief, cannot be moved without the assistance of motorized vessels." *Davis,* 808 F.2d at 362.

purposes of the § 905(b) negligence claim."). *See also Ducrepont,* 877 F.2d at 396 ("As is noted above, the barge in this case is not a vessel under general maritime law. Consequently, under our holding in *Rosetti [v. Avondale Shipyards, Inc.,* 821 F.2d 1083 (5th Cir.1987) ] it cannot be a vessel for purposes of § 905(b)."). Decisions defining the scope of "vessel" under general maritime law, e.g. in Jones Act cases, therefore are applicable to the determination of whether a structure is a vessel for § 905(b) purposes.

Although whether a structure is a vessel is often obvious, in the case of barges used during construction, the determination requires the application of a balancing test that weighs the structure's navigational capability against the its actual use at the time of the accident. *Bernard v. Binnings Construction Co. Inc.,* 741 F.2d 824, 831 (5th Cir.1984).

> A review of these cases [holding that floating work platforms are not vessels] indicates three factors common to them: (1) the structures involved were constructed and used primarily as work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.

*Id.*

It is not necessary for a structure to meet all three *Bernard* factors in order to be found not to be a vessel, *Ducrepont,* 877 F.2d at 395; the three are simply among the relevant factors in determining whether the structure's "primary purpose is to provide a work platform, even if the structure[ ] [is] afloat." *Bernard,* 741 F.2d at 830.

 There is simply not enough evidence before me to conclude that there is no genuine issue of material fact that the CP–4 is not a vessel as a matter of law. In support of its motion for summary judgment, Volks has submitted the affidavit of Laverne King, formerly the president of Volks and presently the custodian of business records for Volks.

Affidavit of Laverne King attached to Volks' Supplemental Memorandum in Support. Volks also has included the tug invoices for the movement of the CP4/KS412 barge assembly, Exhibits 1, 2, and 3 attached to Volks' Supplemental Memorandum in Support, a well as the daily charge tickets setting forth the activities with respect to the two-barge assembly, Exhibit 4 attached to Volks' Supplemental Memorandum in Support.

Laverne King does not indicate anywhere in his affidavit that he personally witnessed the operation or movement of the two barges during the course of repairs to Kaiser's dock. However, exhibits 1–4 appear to be business records and therefore not hearsay. Affidavit of Laverne King, pp. 2–3. Exhibit 2, which appears to be an invoice ticket, is completely illegible. Exhibits 1 and 3 are typed, but unfortunately, indecipherable. For example, the relevant contents of Exhibit 1 are as follows:

> 1100 DEPT BASE LITE BOAT
> 1630 ARR KAISER GRAMMERCY WORK AS DIRECTED
> 1700 SHIFT RIC 101 AND CP 15 AT DOCK
> DEPT N/B WITH KS 412 AND CP 4
> 11/22 0300/0330 DROP A C RAY LANDING LITE TO BASE
> 0400 FINISH OFF JOB
> 17 HRS AT 80.00 [24]

I am not certain of the relevance of Exhibit 4, attached to King's deposition, to the operation or movement of the CP4.

Plaintiffs note that the CP4 was used to transport material from Volks' landing to Kaiser's dock. Deposition of Bobby McDonald (Volks' foreman), p. 48, Exhibit C attached to Plaintiffs' Second Supplemental Memorandum in Opposition. The CP4/KS412 assembly was moved at least once during the course of the repairs to Kaiser's dock, apparently while the crane and construction materials were still on the barge assembly. Deposition of Bobby McDonald, p. 50, Exhibit D attached to Plaintiffs' Second Supplemental Memorandum in

---

24. Exhibit 3 is more extensive, albeit no more illuminating.

Opposition. After completion of the repairs to Kaiser's dock, discarded material was loaded onto the material barge for disposal. Deposition of Bobby McDonald, p. 51, Exhibit F–2 attached to Plaintiffs' Second Supplemental Memorandum in Opposition; Deposition of Earl McDonald, (Volks supervisor), p. 48, Exhibit F–1 attached to Plaintiffs' Second Supplemental Memorandum in Opposition.

Accordingly, I conclude that there exists genuine issues of material fact regarding whether the CP4 was a vessel within the scope of § 905(b) at the time of the accident.

**B. Admiralty Jurisdiction**

Section 905(b) of the LHWCA is not a grant of federal subject matter jurisdiction; rather, § 905(b) "only authorizes a cause of action when [admiralty] jurisdiction already exists." *Margin v. Sea–Land Services, Inc.,* 812 F.2d 973, 975 (5th Cir.1987) (*citing May v. Transworld Drilling Co.,* 786 F.2d 1261, 1263 (5th Cir., *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986)); *see also Christoff v. Bergeron Industries, Inc.,* 748 F.2d 297 (5th Cir.1985).

■ In order to be cognizable as a maritime tort, a claim must meet both a locality test and a nexus test. *Sisson v. Ruby,* 497 U.S. 358, 361–62, 110 S.Ct. 2892, 2895–96, 111 L.Ed.2d 292 (1990); *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (rejecting strict "locality" test of *The Plymouth,* 3 Wall. 20, 18 L.Ed. 125 (1866)); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) (extending application of *Executive Jet* and its situs/nexus test outside of the aviation context). In *Richendollar,* 819 F.2d at 125, the Fifth Circuit stated that

> We further hold that to be cognizable under § 905(b), a tort must occur on or in navigable waters subject, or course, to the special provisions of the Admiralty Extension Act [46 U.S.C. § 740], and there must be the traditional admiralty nexus. [*citing*

*Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).]

**1. Locality Test**

■ In evaluating whether a particular injury meets the "situs" test of *Executive Jet/Foremost,* the Fifth Circuit has applied an "impact" analysis which looks to where the negligence "took effect." *Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283, 288 (5th Cir.1989). However, extensions of land, such as a dock, are not within admiralty jurisdiction. *Rodrigue v. Aetna Casualty and Surety Co.,* 395 U.S. 352, 360, 89 S.Ct. 1835, 1839, 23 L.Ed.2d 360 (1969) ("Admiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea."). Consequently, an injury that is caused by shore-based equipment or negligence is not within admiralty jurisdiction, even if the injury takes place over navigable water. *Parker v. South Louisiana Contractors, Inc.,* 537 F.2d 113 (5th Cir.), *cert. denied* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977) (injury on steel ramp attached to land and projecting over navigable water not within admiralty jurisdiction).[25]

■ Had Efferson simply grabbed the angle iron for some undetermined reason and fallen onto the CP4, admiralty jurisdiction would be lacking; the negligence, if any, would be limited to Kaiser's dock. Plaintiffs, however, claim that the accident was caused by the combined effect of the unreasonably dangerous condition of Kaiser's dock *and* the negligent placement of the ladder extending from the CP4 to the face of the dock. Therefore, the proper inquiry is first whether an injury caused by the allegedly negligent ladder can satisfy the nexus requirement, and second whether the allegedly defective condition of the angle iron was a superseding cause of Efferson's injuries.

---

**25.** The fact that a plaintiffs falls *into* navigable water after a negligent act consummated on shore does not confer admiralty jurisdiction. *See, e.g., Bible v. Chevron Oil Co.,* 460 F.2d 1218 (5th Cir.), *cert. denied,* 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972) ("Since the substance and consummation of the occurrence giving rise to the injuries sustained took place on the drilling platform, the fact that Bible ultimately wound up in the drink does not transform this 'land based' injury into a maritime injury.").

The Admiralty Extension Act refined [26] the definition of admiralty jurisdiction to cover those injuries "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C.App. § 740. Assuming here that the CP4 was a vessel and that it was located on navigable water at the time of the accident [27], the issue is whether the vessel, i.e. its ladder, proximately caused Efferson's alleged injuries. *Margin*, 812 F.2d at 975.

In the seminal case of *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), the Supreme Court held that a longshoreman, suing for injuries sustained when defective cargo containers spilled beans onto a dock, properly raised a claim within admiralty jurisdiction under the Admiralty Extension Act. Since the tortious act occurred while or before the ship was being unloaded, admiralty jurisdiction was implicated even though the impact of the tortious act was felt on land. *Id.* at 210, 83 S.Ct. at 1188.

In contrast, an injury not caused by an "appurtenance of a ship" does not create admiralty jurisdiction. *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). The Fifth Circuit in *Margin* harmonized *Gutierrez* and *Victory Carriers* as follows:

> The rule that we derive from *Gutierrez* and *Victory Carriers* is that, to invoke maritime jurisdiction under the Admiralty Extension Act, a *plaintiff injured on shore must allege that the injury was caused by a defective appurtenance of a ship on navigable water.* It is not enough that the plaintiff alleges he was engaged in stevedoring activities and the accident would

not have occurred but for the presence of the ship alongside the dock. *The vessel or its defective appurtenances must be the proximate cause of the accident.*

*Margin*, 812 F.2d at 975 (emphasis added).

Plaintiffs contend that Volks' failure to extend the aluminum ladder, an appurtenance of the CP4 [28], sufficiently above the surface of Kaiser's dock constituted negligence which was the proximate cause of Albert Efferson's injuries. In brief, plaintiffs assert that had the ladder been of the proper height, Albert Efferson would have had no reason to grab the angle iron to steady himself in preparation for climbing onto the ladder. Thus, both acts of negligence, the failure of the ladder to be of the proper height and the failure of the angle iron, are to be considered the proximate cause of Efferson's injuries. Defendant Volks asserts that Kaiser's negligence, if any, constituted the sole proximate cause of Albert Efferson's injuries.[29]

As a matter of law, I cannot conclude that the CP4 did not proximately cause Efferson's injuries. At issue is whether the allegedly negligent condition of Kaiser's dock was not only an *intervening* cause of Efferson's injuries, but also a *superseding* cause that would relieve Volks from liability. The Restatement, Second, Torts § 440 (1965) states,

> A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

> However,

> Where the negligent conduct of the actor creates or increases the foreseeable risk of

---

26. The Fifth Circuit has made clear that the Admiralty Extension Act does not expand admiralty jurisdiction. *Richendollar*, 819 F.2d at 125.

27. No party contests that the water around defendant Kaiser's dock was navigable.

28. Volks contends that the ladder was not an appurtenance of the CP4 and cites *Steele v. Helmerich & Payne Intern. Drilling Co.*, 738 F.2d 703 (5th Cir.1984). *Steele*, however, is a case interpreting Louisiana law. *Id.* at 705 (determining whether stabbing board of derrick rig is appurtenance of rig for purposes of La.Civ.Code Ann. art. 2322). While the ladder was not a

permanent part of the CP4, *see* Affidavit of Bob McDonald, Sr. attached to Volks' Memorandum in Support, there are not enough facts before me to determine whether the ladder, as a matter of law, was an appurtenance of the CP4 at the time of the accident.

29. Volks in its motion does not appear to be arguing that the placement of the ladder was not negligent. Rather, Volks argues that regardless of the negligence of the ladder, if any, the intervention of the angle iron relieves it of any liability.

harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.

The Restatement, Second, Torts § 442A (1965).

None of the parties have submitted any evidence demonstrating exactly how the portable ladder was extended from the barge to the dock face, and, in particular, how. and where the ladder was tied off on the dock face.[30] Furthermore, none of the parties have offered evidence demonstrating whether the placement of the ladder did or did not necessitate Efferson's grabbing onto the angle iron in order to get. onto or off the ladder.[31] Accordingly, I conclude that genuine issues of material fact exist regarding whether any alleged negligence of Volks proximately caused Efferson's injuries.

2. Maritime Nexus

 In addition to the locality test, the alleged wrong must "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). The Fifth Circuit has developed a balancing test to . determine whether a particular case meets this nexus requirement. *See Kelly v. Smith,* 485 F.2d 520 (5th Cir.), *cert. denied sub nom., Chicot Land Co. v. Kelly,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), *Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir.1987), and *Molett v. Penrod Drilling Co.,* 872 F.2d 1221 (5th Cir.), *cert. denied sub nom., Columbus–McKinnon v. Gearench, Inc.,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). The four factors typically considered include

1) the function and roles of the parties;

2) the types of vehicles and instrumentalities involved;

3) the causation and type of injury; and

4) the traditional concepts of the role of admiralty law.

*Kelly,* 485 F.2d at 525.

In *Sisson* the Supreme Court articulated a different test that looks first to whether the incident at issue is a potential hazard to maritime commerce and then to whether the activity giving rise to the injury bears a substantial relationship to traditional maritime activity. *Sisson,* 497 U.S. at 362–64, 110 S.Ct. at 2895–97. Although the Supreme Court did survey the jurisprudence of the various circuits on the second part of the *Executive Jet/Foremost* test, it declined to adopt any single ·test for situations in which the "relevant entities are [not] engaged in similar types of activity." *Id.* at 365 n. 4, 110 S.Ct. at 2898 n. 4. *When* the relevant entities are engaged in similar types of activity is, unfortunately, unclear, *see id.* at 365 n. 3, 110 S.Ct. at 2897 n. 3, and the Fifth Circuit has concluded that it will follow the *Kelly* approach in absence of further guidance from the Supreme Court. *Broughton v. Offshore Drilling v. South Cent. Mach.,* 911 F.2d 1050, 1052 n. 1 (5th Cir.1990).

Whether or not the CP4 was a "vessel" at the time of the accident, and whether the CP4 proximately caused Efferson's alleged injuries, are material to the determination of whether admiralty jurisdiction exists in this case under the *Kelly* test. Because these issues remain open, I cannot conclude that, as a matter of law, plaintiffs' claim against Volks is not supported by admiralty jurisdiction.[32]

---

**30.** Plaintiffs have submitted a photograph of the alleged accident site. Exhibit 6 attached to Plaintiffs' Supplemental Memorandum in Opposition. This photograph is too deficient in perspective and detail to be of any substantial assistance.

**31.** Plaintiffs have submitted what appears to be a Fed.R.Civ.P. 30(b)(6) deposition of Volks in which the deponent opines that the ladder did not extend far enough above the surface of the dock. Exhibit 6 attached to Plaintiffs' Supplemental Memorandum in Opposition. However,

it appears that the deponent's opinion is based on hearsay as opposed to personal knowledge.

**32.** Volks cites a number of cases in support of its position that even if the CP4 is deemed a vessel, plaintiffs' claim against Volks does not fall within admiralty jurisdiction. *See, e.g., Watson on behalf of Watson v. Massman Construction Co.,* 850 F.2d 219 (5th Cir.1988); *West v. Chevron U.S.A., INC.,* 615 F.Supp. 377 (E.D.La.1985). In the cited cases, however, the vessel at issue either was a "passive factor" leading to the plaintiff's injury, or the alleged appurtenance causing the

*Insurer's Motions for Summary Judgment*

Four insurance companies have filed what are in effect cross motions for summary judgment requesting the Court to determine who is primarily liable to the alleged insured, defendant Volks, in the event that Volks is found liable to Efferson. The four companies are The West of England Ship Owners Mutual Insurance Association (Luxembourg) ("West of England"); Aetna Casualty & Surety Company ("Aetna"); Baloise Insurance Company of America ("Baloise"); and Ocean Marine Indemnity Company ("Ocean Marine").[33] Disregarding certain "other insurance" clauses, Aetna and West of England do not contest that their policies cover plaintiffs' claim against Volks. Baloise and Ocean Marine assert that their policies do not cover plaintiffs' claim against Volks.

The parties do not dispute either the policies' existence or contents.[34] Attached to Baloise's motion for summary judgment are all of the relevant policies. Exhibits 1–4 attached to Baloise's Memorandum in Support.

A. **Coverage of Baloise and Ocean Marine's Policies**

The policies issued by Baloise and Ocean Marine were not issued to Volks, but rather to Verrett Shipyard, Inc. ("Verrett"), the owner of the CP4.[35] Verrett had bareboat chartered the CP4 to Volks for use during the course of repairs to Kaiser's dock. The Baloise policy provides Hull and Protection and Indemnity ("P & I") coverage to certain scheduled vessels, including the CP4. Furthermore, coverage under the policy is extended to certain listed "additional assureds," including Volks. *See* Endorsement No. 1 ("Additional Assured and Waiver of Subrogation Form") to Baloise Policy.[36]

The Ocean Marine policy is essentially an excess P & I insurance policy issued to Verrett which follows the form of the Baloise policy.[37] Consequently, Ocean Marine's liability is derivative of Baloise' liability in the sense that if a claim is not covered by the Baloise policy, then it is not covered by the Ocean Marine policy. *See* "Excess Protection and Indemnity," p. 4, Ocean Marine Policy. No party contests that if Baloise is not liable for plaintiffs' claim, then Ocean Marine is not liable for plaintiffs' claim.

At issue is whether a clause in the Baloise policy purporting to limit the policy's coverage is ambiguous. On a form identified as "SP–38" under a section entitled "Special Conditions—Warranties—Endorsements, Etc.," the Baloise policy states,

> P & I Excludes Crew and Employees of Assured and or Affiliated Companies.

Baloise contends that Volks is an "assured" as used in the clause, and that the provision excludes from coverage the as-

---

injury was peculiarly non-maritime. In contrast, plaintiffs allege that the ladder was effectively a gangplank, and that the negligent placement of the ladder led to Efferson's alleged injuries. I therefore find the cases cited by Volks to be unpersuasive.

**33.** How the insurance companies became parties to this action is needlessly complex and need not be repeated in great detail here. West of England assumed the defense of Volks in this action and entered an appearance to defend Volks against the claims asserted by plaintiffs. Volks then filed third-party complaints against Aetna, Baloise, and Ocean Marine, seeking indemnity and defense from these insurers. Numerous cross-claims and third-party claims were filed among the insurers. Also, Aetna, as Volks' LHWCA insurer, has intervened in this action.

**34.** All of the relevant parties agree that Louisiana law governs the interpretation of the insurance contracts at issue. *See Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 886 (5th Cir.), *cert. de-*

nied, —— U.S. ——, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991).

**35.** The facts relating to the policies issued by Baloise and Ocean Marine are derived from Baloise's memorandum in support. None of the parties contest the facts surrounding the issuance of the policies.

**36.** Endorsement No. 1 states, in relevant part, that

> It is understood and agreed that while the insured vessel(s) is/are working for or performing services for "AS PER ATTACHED" and/or its affiliated, subsidiary or interrelated companies, ... are named as additional assureds hereunder.

**37.** As relates specifically to the CP4, Baloise's policy covers, if applicable, the first $300,000.00 of liability, and Ocean Marine's policy covers the next $200,000.00 of liability.

sured's liability to its employees, i.e. Efferson. I agree.

 Under Louisiana law, when an ambiguity relates to an exclusionary clause of an insurance policy, the policy is interpreted liberally in favor of providing coverage. *See, e.g., Scarborough v. Northern Assur. Co. of America,* 718 F.2d 130 (5th Cir.1983) (*citing Hanagriff's Mach. Shop, Inc. v. Slaw Const. Co., Inc.,* 380 So.2d 146, 148 (La.App. 1st Cir.1979)). In contrast, a clear and unambiguous provision in an insurance contract which limits liability must be given effect. *See, e.g., Sargent v. La. Health Serv. & Indem. Co.,* 550 So.2d 843 (La.App. 2nd Cir.1989). Whether a contract is ambiguous is a question of law to be decided by the court. *Kahn v. Dufrene,* 587 So.2d 706, 708 (La.App. 5th Cir.), *writ denied,* 592 So.2d 1315 (La.1992); *West v. Harris,* 573 F.2d 873, 877 (5th Cir. 1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979).

"Louisiana courts do not take it upon themselves to 'interpret' contracts which are not ambiguous." *Smith v. Mobil Corp.,* 719 F.2d 1313, 1317 (5th Cir.1983). "In Louisiana, a contract is to be read according to its plain intendment, and absent ambiguity contractual obligations are to be enforced as written." *Foreman v. Exxon Corp.,* 770 F.2d 490, 495 (5th Cir.1985) (citations omitted). "Contracts need only be 'construed' where there is some doubt as to the meaning of the language employed." *Smith v. Mobil Corp.,* 719 at 1317. "The fact one party can, in hindsight, create a dispute about the meaning of a contractual provision does not render the provision ambiguous. The court must give effect to the ordinary meaning of the words and may not create an ambiguity where none exists." *Esplanade Oil and Gas, Inc. v. Templeton Energy Income Corp.,* 889 F.2d 621, 623–24 (5th Cir.1989).

 Aetna and West of England maintain that the term "assured" as used in the clause does not include any "additional assured." *See* Endorsement No. 1 to Baloise Policy.[38] In effect, Aetna and West of England are arguing that the word "additional" is used as a noun rather than as an adjective. I find this argument unpersuasive. *See Storebrand Arendal A/S v. Point Marine Company, Inc.,* 1990 AMC 2689, 1990 WL 66401 (E.D.La.1990), *aff'd without opinion,* 923 F.2d 853 (5th Cir.1991).

To read into the policy the distinction suggested by Aetna and West of England would alter radically the terms of coverage provided to an "additional assured," such as Volks, from what I believe is the plain meaning of the policy. The singular "assured" is used throughout the policy.[39] To interpret the policy to apply to an "additional assured" only when the term "additional assured" is used explicitly would render Endorsement No. 1 superfluous. It appears that with the exception of Endorsement No. 6, which adds Double Eagle Marine, Inc. as an "additional assured," the term "additional assured" does not appear *anywhere* in the policy other than in Endorsement No. 1.

Aetna argues that even if Volks is considered to be an assured for purposes of the clause, what exactly is excluded from coverage is ambiguous. Aetna contends that it is unclear whether the clause intends to exclude from coverage all liability *to* crew and employees of the assured, or whether, *inter alia,* the clause intends to exclude from coverage all liability created *by* the actions of the crew and employees as opposed to by the vessel itself. I find no such ambiguity.

The Baloise policy provides coverage, *inter alia,* for the

---

**38.** Verrett is identified as the "assured" in the policy, while thirty-six other entities, including Volks, are identified as "additional assureds." Schedule of Additional Assureds attached to Endorsement No. 1 to Baloise Policy.

**39.** For example, the very first line of the Baloise policy states,

In consideration of the premium above specified and subject to the warranties (express or implied), stipulations, terms and conditions of this form and of the form attached hereto, this Company hereby insures the named *Assured* upon the property or interest described in the attached form to an amount or amounts specified therein.

(emphasis added). *See also* Form SP–38 ("Loss, if any, payable to Assured or Order"); Endorsement Nos. 3 and 4. I note that Endorsement No. 2 does use the term "assured(s)" rather than the singular "assured."

Loss of life of, or injury to, or illness of, any person; [and] Hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life or, injury to, or illness of any member of the crew of the vessel named herein.

Form SP–38, Baloise Policy.[40] The clause at issue clearly and unambiguously removes from the scope of this coverage the "Crew and Employees of Assured."

### B. Primary Liability for Plaintiffs' Claims against Volks

The remaining insurance issue concerns the conflict between the "other insurance" clauses in the Aetna and West of England policies.[11] The "other insurance" clause in the Aetna policy is a pro-rata clause that states,

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

Aetna Policy, p. 20.

The "other insurance" clause in the West of England policy is an escape clause:

Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance or otherwise.

West of England Policy, p. 4.

At issue is what effect, if any, should be given to either of the two clauses. Aetna contends that the two clauses are mutually repugnant, and therefore the two policies are to be considered co-insurance.[42] West of England counters that the two clauses are not mutually repugnant, and that effect should be given to its escape clause.

Several cases interpreting Louisiana law have addressed conflicting "other insurance" provisions, and, in the absence of definitive guidance from the Supreme Court of Louisiana, my "task is to determine, to the best of [my] ability, how that court would rule if the issue were before it." *Ladue*, 920 F.2d at 274;[43] *see also Transcontinental Gas v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir.1992).

■ This Court has held that in a conflict between an escape clause and a pro-rata clause, the policy containing the pro-rata clause is primarily liable. *Layton v. Land and Marine Applicators, Inc.*, 522 F.Supp. 679 (E.D.La.1981) (Boyle, J.).[44] I find the

---

**40.** The Baloise policy also provides coverage for Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature.
[and]
Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured.
Form SP–38, Baloise Policy. The clause at issue does not affect this coverage.

**41.** As I stated in my decision in *Offshore Logistics Services, Inc. v. Mut. Marine Office, Inc.*, 462 F.Supp. 485 (E.D.La.1978),
Most insurance policies contain some sort of "other insurance" clause which provides what is to be done when two separate policies offer coverage for the same liability. These "other insurance" clauses generally fall into three categories: escape, excess, and pro rata clauses. The escape clause renders the policy in which it is contained completely inapplicable if other

insurance exists. The excess clause renders the policy excess to the other insurance. And the pro rata clause provides that the two policies contribute to the loss in proportion to their limits of liability. Within these three categories innumerable variations exist.

**42.** Aetna asserts that any liability arising out of plaintiffs' claim against Volks should be prorated in proportion to the coverage limits of the two policies.

**43.** Judge Rubin, writing for the court in *Ladue*, noted that "[w]e are therefore bound by an intermediate state appellate court decision only when we remain unconvinced 'by other ... data that the highest court of the state would decide otherwise.'" *Ladue*, 920 F.2d at 274 (*quoting West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)).

**44.** This Court in *Layton* in fact gave Mission, the insurer with the "escape" clause, *more* than it asked for in its motion for summary judgment.

reasoning in *Layton* to be persuasive. In contrast to a situation involving a conflict between two escape or two excess clauses[45], giving effect to both clauses in this case does not render the insured without any coverage. *See also Viger v. Geophysical Services, Inc.*, 338 F.Supp. 808 (W.D.La.1972), *aff'd and adopting district court opinion*, 476 F.2d 1288 (5th Cir.1973).

The escape clause in the West of England policy relieves West of England of any liability if there exists other insurance covering the claim at issue. West of England Policy, p. 4. The pro-rata clause in the Aetna policy shares coverage responsibility only of "damages and costs *covered* by this insurance *and other insurance* or self-insurance." Aetna Policy, p. 20 (emphasis added). Even if full effect is given to the Aetna policy's pro-rata clause, plaintiffs' claim against Volks does not constitute "damage and costs covered" by the West of England policy due to the operation of the escape clause. *See Viger*, 338 F.Supp. at 812.[46]

Aetna cites a recent Louisiana appellate decision as support for its position that the pro-rata and escape clauses are mutually re-

pugnant. *Penton v. Hotho*, 601 So.2d 762 (La.App. 1st Cir.1992). I do not find *Penton* to be dispositive of the issue before me. Factually, *Penton* involved a conflict between a pro-rata clause and an excess clause in two separate policies. Although the court in *Penton* implied that all "other insurance" clauses are mutually repugnant to each other[47], the narrow holding of the court is that "we find the 'excess' and 'pro rata' clauses to be mutually repugnant and ineffective." *Id.* at 768.

I note the Supreme Court of Louisiana in *Graves v. Traders & General Ins. Co.*, 214 So.2d 116, 188 (1968), has indicated that a court, applying Louisiana law, is to endeavor to reconcile and give effect to allegedly conflicting "other insurance" clauses:

Our study of the "other insurance" clauses [both of which contain excess clause components] quoted from the two policies makes clear that they cannot be reconciled, and if the provisions of both policies are given effect, neither insurer would be liable. Such a result would render all insurance nugatory and produce absurdity

Although it appears that Mission was willing to provide coverage in excess to that provided by the policy with the pro rata clause, this Court held that Mission was relieved of *"all"* responsibility" to the insured. *Layton*, 522 F.Supp. at 682 n. 3, 683. In short, the escape clause was given full effect.

**45.** *See, e.g., Graves v. Traders & General Ins. Co.*, 214 So.2d 116 (1968), *Rini v. Transocean Contractors*, 1981 A.M.C. 1128 (W.D.La.1981). In *Voisin v. Ocean Proteins, Inc.*, 321 F.Supp. 173 (E.D.La.1970), this Court held that a pro-rata clause and an escape clause found in two separate policies should be disregarded and that the two insurers should be required to share equally the defense and liability for the plaintiff's claim. *Voisin* relied upon *Graves*, a case involving two excess clauses. A agree with my Brother Boyle's disapproval of the result in *Voisin*. *Layton*, 522 F.Supp. at 683.

**46.** The court in *Viger* observed,

Thus, reading the Hanover and Continental clauses together, the only conclusion is that GSI has no "other insurance against a loss covered by this policy" within the meaning of the Continental policy. The escape clause of the Hanover policy prevents "other insurance" from ever coming into existence. The coverage of the Hanover policy does not extend to this matter and the "pro-rata" clause of the

Continental policy never becomes effective since the requisite "other insurance" does not exist.

*Viger*, 338 F.Supp. at 812.

In other words, the escape clause in the West of England policy went into effect the moment the Aetna policy came into existence—i.e. for purposes of the pro-rata clause, the West of England policy ceased to exist. That no other policy exists with which to pro rate costs and damages does not fail to give the pro-rata clause effect.

**47.** *Penton* relied heavily on *Lamb–Weston, Inc. v. Oregon Auto, Inc. Co.*, 219 Or. 110, 341 P.2d 110, *mod. on reh.*, 219 Or. 110, 346 P.2d 643 (1959), and its progeny, and quoted from the decision as follows:

The 'other insurance' clauses of all policies are but methods used by insurers to limit their liability, whether using language that relieves them from all liability (usually referred to as an 'escape clause') or that used by St Paul (usually referred to as an 'excess clause') or that used by Oregon (usually referred to as a "prorata clause"). In our opinion, whether one policy uses one clause or another, when any come in conflict with the 'other insurance' clause of another insurer, regardless of the nature of the clause, they are in fact repugnant and each should be rejected in toto.

*Penton*, 601 So.2d at 768.

which neither the insured nor the insurers contemplated.

■ This approach, followed in *Layton* and *Viger*, is in direct conflict with that in *Penton*, which appears to assume that any such effort "is the equivalent of pursuing a 'will o' the wisp.'" *Penton*, 601 So.2d at 768 (adopting *per se* rule that all "other insurance" clauses are mutually repugnant to each other). Absent direction from the Supreme Court of Louisiana to the contrary, I conclude that the proper approach is to attempt to give effect to both "other insurance" clauses and to find them mutually repugnant only if the insured is left with no coverage.[48] Both clauses at issue can be given effect without leaving Volks with no coverage; the escape clause in the West of England policy relieves West of England of all liability for plaintiffs' claim against Volks.

*Plaintiff's Motion for Trial by Jury*

Plaintiffs, pursuant to Rule 39(b) of the Federal Rules of Civil Procedure, have filed a motion for a trial by jury. In the alternative, plaintiffs request an advisory jury pursuant to Rule 39(c).

In my Memorandum and Order entered on September 21, 1992, I denied plaintiffs' second motion to remand this action. Plaintiffs had argued that the addition of Volks as a defendant destroyed complete diversity, the original basis for removal. Specifically, I stated,

> Quite simply, plaintiffs asserted an *admiralty* claim against Volks when they amended their complaint. Federal courts have exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction ..." 28 U.S.C. § 1333(1). Plaintiffs' state law claims against Kaiser, which were originally brought in state court, are within my supplemental jurisdiction. 28 U.S.C. § 1367.

I agree with Kaiser that the Fifth Circuit's decision in *Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063 (5th Cir.), *cert. denied*, 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981), controls this issue, although this case is not directly on point.[49] The plaintiff in *Powell* originally brought a maritime claim against a non-diverse defendant. After the district court granted the defendant's motion to strike the plaintiff's jury demand, the plaintiff amended his complaint to add three diverse defendants. The plaintiff asserted that diversity jurisdiction was proper as to these three defendants, and that a jury trial was proper on grounds that his claims against the diverse defendants were common law claims. *Id.* at 1064–65 (*citing* the "savings to suitors" clause of 28 U.S.C. § 1333(1)).

The Fifth Circuit affirmed the district court's denial of the plaintiff's request for a trial by jury. *Id.* at 1064. The court distinguished the Supreme Court's decision in *Romero v. International Terminal Operating Company*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), which held that diversity jurisdiction is not destroyed when a Jones Act claim, 46 U.S.C.App. § 688, is subsequently brought against a non-diverse defendant. *Id.* at 381, 79 S.Ct. at 485 ("the Jones Act provides an *independent basis* of federal jurisdiction over the non-diverse respondent ...") (emphasis added). The Fifth Circuit in *Powell* held that an "independent basis" included only federal question jurisdiction, 28 U.S.C. § 1332, and not admiralty jurisdiction, 28 U.S.C. § 1333. *Powell*, 644 F.2d at 1068 ("we think it clear that the *Romero* exception to the rule of *Strawbridge v. Curtiss* [3 Cranch 267, 2 L.Ed. 435 (1806)] applies only in the narrower circumstances stated by the district court—*i.e.*, where a *non-admiralty* basis of jurisdiction exists over the non-diverse defendants.") (original emphasis).

**48.** I reiterate my statement made in *Offshore Logistics*, 462 F.Supp. at 493:

> In each of these cases the court attempted through careful analysis to reconcile and give full effect to both of the [other insurance] clauses where possible, instead of seizing upon the convenient but often facile solution of di-

viding or prorating liability between the two companies.

**49.** Because I conclude that *Powell* is dispositive of plaintiffs' motion, I do not determine whether plaintiffs' demand for a trial by jury is timely under either Rule 38 or Rule 39 of the Federal Rules of Civil Procedure.

The court in *Powell* based its decision on the particular concern that the "savings to suitors" clause not be employed along with diversity jurisdiction to defeat the longstanding rule that an admiralty claim is not entitled to a trial by jury.[50] The court noted,

Here the plaintiff seeks an action at law and therefore a jury trial by virtue of diversity jurisdiction rather than by virtue of general federal question jurisdiction, but in both cases the ultimate object is the trial of an admiralty claim through an alternative grant of federal jurisdiction.

*Powell*, 644 F.2d at 1070.

■ Where a plaintiff's claims against a number of defendants fall within admiralty jurisdiction but also are within the scope of the "savings to suitors" clause of 28 U.S.C. § 1333(1), the Fifth Circuit held that the plaintiff cannot obtain a jury trial for an admiralty claim by simply asserting common law claims under the "savings to suitors" clause against the diverse defendants.[51]

In the case before me, plaintiffs assert a § 905(b) claim against Volks that can be brought only as an admiralty claim pursuant to this Court's admiralty jurisdiction. 28 U.S.C. § 1333; *Richendollar*, 819 F.2d at 128. I recognize that plaintiffs' claims against Kaiser are non-admiralty claims since they cannot meet the locality test for admiralty jurisdiction. Therefore, the Fifth Circuit's concern with a plaintiff "splitting" his admiralty claim by means of the "savings to suitors" clause in order to obtain a jury trial is not present here.[52]

■ Nevertheless, I am bound by the clear rule established in *Powell*: [53]

We hold that diversity jurisdiction did not lie because of the absence of complete diversity between the plaintiff and all of the defendants, and that this defect was not remedied by the plaintiff's assertion of admiralty jurisdiction over the non-diverse defendant.

*Powell*, 644 F.2d at 1064 (affirming district court's denial of plaintiff's request for a trial by jury and affirming judgment in favor of defendants).

Complete diversity clearly does not exist in this case; both plaintiffs and Volks are citizens of Louisiana.[54] The claims against Kaiser are not supported by any independent basis of jurisdiction. Rather, they fall within my supplemental jurisdiction. 28 U.S.C. § 1367. The one claim that does support subject matter jurisdiction, plaintiffs' § 905(b) claim against Volks, is an admiralty claim that can be brought only pursuant to this Court's admiralty jurisdiction. There is no right to a jury trial as to this admiralty claim. *Russell*, 625 F.2d at 72 ("Jurisdiction of the [§ 905(b)] claim of Mrs. Russell is based upon general admiralty law. This being so, there is no right to a trial by jury.").

Accordingly,

---

**50.** Admiralty claims historically do not enjoy a right to a trial by jury. *See Russell v. Atlantic & Gulf Stevedores*, 625 F.2d 71 (1980); *Harrison v. Flota Mercante Grancolombiana S.A.*, 577 F.2d 968, 985–88 (5th Cir.1978); *Romero v. Bethlehem Steel Corp.*, 515 F.2d 1249 (5th Cir.1975).

**51.** The Fifth Circuit recognized that a plaintiff can obtain a trial by jury if the plaintiff's admiralty claims are properly raised pursuant to the "savings to suitors" clause *and* complete diversity exists. *Powell*, 644 F.2d at 1065 ("No party has disputed Powell's contention that a plaintiff asserting a maritime claim arising under the common law and brought in federal court by virtue of its diversity jurisdiction may indeed be tried by a jury.").

**52.** Indeed, admiralty claims are often tried to a jury. *See Fitzgerald v. United States Lines*, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) (a maintenance and cure claim joined by pendent jurisdiction with a Jones Act claim must be submitted to the jury when both arise from one set

of facts); *See also Woosley v. Mike Hooks, Inc.*, 603 F.Supp. 1190 (W.D.La.1985).

**53.** A review of the subsequent caselaw from the Fifth Circuit interpreting *Powell* does not indicate that *Powell* is to be limited to its specific facts and circumstances. The holding of *Romero* and its subsequent limitation by *Powell* was reaffirmed by the Fifth Circuit in *Brown v. Mine Safety Appliances Co.*, 753 F.2d 393 (5th Cir. 1985). *See also Bynum v. Patterson Truck Lines, Inc.*, 655 F.2d 643 (5th Cir.1981); *Lowe v. Ingalls Shipbuilding, A Div. of Litton*, 723 F.2d 1173 (5th Cir.1974); *Forbes v. A & P Boat Rentals, Inc.*, 689 F.Supp. 625 (E.D.La.1988) (Schwartz, J.).

**54.** I pretermit the issue of whether the citizenship of the third-party defendants must be considered in the determination of whether complete diversity exists in this action.

IT IS ORDERED that all claims against defendants Robert Ginn and Jack Carmena are DISMISSED with prejudice.

IT IS FURTHER ORDERED that defendant Kaiser's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that defendant Volks' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that plaintiffs' motion for a trial by jury is DENIED.

IT IS FURTHER ORDERED that defendant Baloise's motion for summary judgment is GRANTED. All claims against Baloise are dismissed with prejudice.

IT IS FURTHER ORDERED that defendant Ocean Marine's motion for summary judgment is GRANTED. All claims against Ocean Marine are dismissed with prejudice.

IT IS FURTHER ORDERED that defendant West of England's motion for summary judgment is GRANTED. All claims against West of England are dismissed with prejudice.

IT IS FURTHER ORDERED that defendant Aetna's motion for summary judgment is DENIED.